UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IRONSHORE SPECIALTY INSURANCE COMPANY,<br><br>                                    Plaintiff,<br><br>v.<br><br>THE CROSBY ESTATE AT RANCHO SANTA FE MASTER ASSOCIATION,<br><br>                                    Defendant. | Case No.:  21-cv-1249-WQH-AHG<br><br>**ORDER** |
| THE CROSBY ESTATE AT RANCHO SANTA FE MASTER ASSOCIATION,<br><br>                                    Counter Claimant,<br><br>v.<br><br>IRONSHORE SPECIALTY INSURANCE COMPANY,<br><br>                                    Counter Defendant. | |

HAYES, Judge:

     The matter before the Court is the Motion for Judgment on the Amended Pleadings (ECF No. 57) filed by Plaintiff/Counter Defendant Ironshore Specialty Insurance Company.

## I.   PROCEDURAL BACKGROUND

On July 9, 2021, Ironshore Specialty Insurance Company ("Ironshore") filed a Complaint for Declaratory Relief against The Crosby Estate at Rancho Santa Fe Master Association ("The Crosby"), requesting a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, regarding The Crosby's obligation to satisfy a $150,000 retention in connection with coverage for two underlying actions against The Crosby pursuant to the terms of a 2019-2020 insurance policy. (ECF No. 1.)

On August 18, 2021, The Crosby filed an Answer to the Complaint and a Counterclaim seeking a competing declaration. (ECF No. 19.)

On June 10, 2022, Ironshore filed a First Amended Complaint. (ECF No. 48.) On June 15, 2022, Ironshore filed the operative Second Amended Complaint ("SAC"). (ECF No. 50.)

On June 29, 2022, The Crosby filed an Answer to the SAC and a First Amended Counterclaim. (ECF No. 54.)

On August 17, 2022, Ironshore filed the Motion for Judgment on the Amended Pleadings. (ECF No. 57.) On September 2, 2022, The Crosby filed a Response in opposition to the motion. (ECF No. 58.) On September 12, 2022, Ironshore filed a Reply. (ECF No. 60.)

## II.   ALLEGATIONS IN THE AMENDED PLEADINGS

### A. The Policy

Ironshore issued a Not-For-Profit Entity and Directors, Officers Liability Insurance Policy, Policy No. 002084805, (the "Policy") to The Crosby, a homeowner's association. The Policy insures The Crosby against losses resulting from certain legal claims made against The Crosby or its directors, officers, and employees during the policy coverage period of July 2, 2019, to July 2, 2020.

The "Insuring Agreements" section of the Policy provides:

The **Insurer** [Ironshore] shall pay on behalf of the **Not-For-Profit Entity** [The Crosby] all **Loss** which the **Not-For-Profit Entity** shall be legally

obligated to pay as a result of a **Claim** … first made against the **Not-For-Profit Entity** during the **Policy Period** or the Discovery Period for a **Wrongful Act**, and reported to the **Insurer** pursuant to Section VII.

(Ex. A to SAC, § I(C), ECF No. 51 at 9.) Loss includes various types of damages, "judgments, settlements, pre- and post-judgment interest, and **Costs of Defense**," but does not include "any amount for which the **Insured** [The Crosby] is not financially liable or which is without legal recourse to the **Insured**." *Id.* § II(L) at 11. Costs of Defense is defined in relevant part as "reasonable and necessary legal fees, costs and expenses incurred in the investigation, defense or appeal of any **Claim**." *Id.* § II(C) at 10.

The Policy contains a "Retention" of $150,000 and a "Limit of Liability" of $1,000,000. *Id.* at 4. Ironshore's obligation to pay Loss is limited to amounts "in excess of the applicable Retention amount … up to the Limit of Liability." *Id.* § IV(A) at 16. "One Retention shall apply to **Loss** arising from each **Claim** alleging the same **Wrongful Act** or **Related Wrongful Acts**." *Id.* § V(B) at 16. The Retention "shall apply to all covered **Loss**, including **Costs of Defense**." *Id.* § V(A) at 16; *see also id.* at 4 ("Amounts incurred as Costs of Defense shall reduce the limit of liability available to pay judgments or settlements and shall also be applied against the retention."). "The **Not-For-Profit Entity** shall be responsible for, and shall hold the **Insurer** harmless from, any amount within the Retention." *Id.* § V(B) at 16. The Limit of Liability is an "aggregate limit of liability for all Claims made or deemed made during the Policy Period" and "**Costs of Defense** shall serve to reduce the Limit of Liability." *Id.* at 4; IV(B) at 16.

The "Costs of Defense and Settlements" section of the Policy provides:

> The **Insured**, and not the **Insurer**, have the duty to defend all **Claims** …. The **Not-For-Profit Entity** may at its option tender to the **Insurer** the defense of a **Claim** …. Upon such a tender of the defense of a **Claim**, the **Insurer** shall assume the duty to defend.

*Id.* § VI(C) at 17. "The **Insurer** shall advance **Costs of Defense** prior to the final disposition of any **Claim**, provided such **Claim** is covered by this Policy" and "on the condition that … the appropriate Retention has been satisfied." *Id.* § VI(F) at 17. The Policy provides for

3

the advancement to be repaid "in the event it is finally established that the **Insurer** has no liability under the Policy for such **Claim.**" *Id.* § VI(F) at 17-18. The Crosby "shall not incur **Costs of Defense**" or settle a Claim without obtaining Ironshore's consent unless the settlement is "for an amount that, together with **Costs of Defense**, does not exceed the applicable Retention." *Id.* §§ VI(A), (B) at 17.

**B. The Underlying Claims**

"On April 14, 2020, The Crosby sent Ironshore a demand letter it had received from counsel for the Henkels"—members of The Crosby homeowner's association who "disagreed with The Crosby's decisions regarding certain renovations and modifications to their neighbors' property." (SAC, ECF No. 50 ¶¶ 30, 32.) "On or about June 19, 2020, The Crosby sent Ironshore notice of a landscape modification dispute" between The Crosby and other members, Peter and Tamara Blasi. *Id.* ¶ 42.

"On October 5, 2020, The Crosby received a draft complaint from the Henkels, and sent it to Ironshore on October 6, 2020." *Id.* ¶ 37. "On November 5, 2020 … The Crosby's counsel wrote to Ironshore and stated that it had 'intended to tender the defense of the Henkel Claim to Ironshore, pursuant to Section VI(C) of the Policy" and requesting confirmation that Ironshore would assume the duty to defend. *Id.* ¶ 40. "On November 11, 2020, Ironshore told The Crosby that it appointed counsel to defend the matter …." *Id.* ¶ 41.

"[O]n December 1, 2020, the Blasis filed a complaint against The Crosby in the Superior Court of California …." *Id.* ¶ 45. "[O]n or about December 4, 2020, The Crosby 'tendered the defense' of the Blasi Complaint to Ironshore and asked that counsel be assigned." *Id.* ¶ 47. "On December 10, 2020[,] Ironshore assigned counsel to defend The Crosby in the Blasi matter." *Id.* ¶ 49.

"In connection with both the Henkel Claim and the Blasi Claim, Ironshore initially advised The Crosby that it would be required to satisfy a $150,000 Retention." (First Amended Counterclaim, ECF No. 54 ¶ 17.) "On or about December 22, 2020, The Crosby reached out to Ironshore regarding the Blasi and Henkel matters[, ] asked Ironshore to

'confirm that The Crosby is being asked to satisfy a retention,'" and requested the basis for that position. (SAC, ECF No. 50 ¶ 50.) "Ironshore ultimately agreed to defend the Henkel Claim and Blasi Claim without The Crosby's satisfaction of a Retention, subject to a reservation of rights." (First Amended Counterclaim, ECF No. 54 ¶ 19.)

Ironshore seeks "A judgment declaring that The Crosby must satisfy the Retention even when the duty to defend is tendered and even if no indemnity is required." (SAC, ECF No. 50 at 12.)

The Crosby alleges four affirmative defenses to Ironshore's claim: (1) collateral estoppel; (2) waiver; (3) estoppel; and (4) lack of good faith. In its Counterclaim,

> The Crosby seeks a declaration that (1) the 2019-20 Policy's $150,000 Retention does not apply as a condition precedent to Ironshore's duty to defend where an insured has tendered the defense of a claim pursuant to Section VI(C) of the Policy; (2) The Crosby need not satisfy the 2019-20 Policy's Retention as a condition of Ironshore's duty to defend the Henkel Claim and Blasi Claim; (3) the 2019-20 Policy's Retention does not apply to or limit Ironshore's defense obligations where the Insured has tendered the defense of a Claim in accordance with Section VI(C) of the Policy and Ironshore has assumed the duty to defend; and (4) The Crosby need not satisfy the 2019-20 Policy's Retention in connection with Ironshore's duty to defend the Henkel Claim and Blasi Claim.

(First Amended Counterclaim, ECF No. 54 ¶ 27.)

## III.   LEGAL STANDARD

Rule 12(c) of the Federal Rules of Civil Procedure provides that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). "Judgment on the pleadings is properly granted when there is no issue of material fact in dispute, and the moving party is entitled to judgment as a matter of law." *Chavez v. United States*, 683 F.3d 1102, 1108 (9th Cir. 2012). "Analysis under Rule 12(c) is substantially identical to analysis under [Federal] Rule [of Civil Procedure] 12(b)(6) because, under both rules, a court must determine whether the facts alleged in the complaint, taken as true, entitle the plaintiff to a legal remedy." *Id.* (quotation omitted).

To sufficiently state a claim for relief and survive a Rule 12(b)(6) motion, a complaint "does not need detailed factual allegations" but the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* When considering a motion to dismiss, a court must accept as true all "well-pleaded factual allegations." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). However, a court is not "required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).

## IV.  CONTENTIONS

Ironshore contends that under the Policy, the Retention applies to all Claims and all Loss, including Costs of Defense, regardless of which party defends the Claims. Ironshore contends that "the tender provision does not negate the provisions in the Policy … that make clear that the Retention applies to Costs of Defense." (ECF No. 57-1 at 14 (emphasis omitted).) Ironshore contends that because the Retention applies to costs incurred by Ironshore in defending a tendered Claim, Ironshore is entitled to reimbursement for such costs up to the Retention amount. Ironshore contends that The Crosby's alternative interpretation of the Policy—under which "the tender provision allows [The Crosby] to skip its obligation to ever pay the [Retention] … by simply tendering the Claim to Ironshore"—"produces an absurd result." *Id.* (emphasis omitted). Ironshore contends that The Crosby's affirmative defenses do not preclude judgment on the pleadings because they are not adequately pleaded and do not create a material issue of fact.

The Crosby contends that costs incurred by Ironshore in defending a tendered Claim "fall outside the Policy's definition of Loss and are not subject to the Retention." (ECF No. 58 at 10.) The Crosby contends that the Retention section of the Policy does not "even mention Ironshore's duty to defend," which "suggests the Retention simply does not apply when an insured has tendered the defense of a [C]laim to Ironshore." *Id.* at 12. The Crosby

contends that other provisions of the Policy do not support Ironshore's position because they do not address the effect of a tender on the Retention and are "difficult, if not impossible, to implement under Ironshore's reading." *Id.* at 13. The Crosby contends that ambiguity in the Policy should be resolved in favor of the insured. The Crosby contends that "The Crosby's assertion of affirmative defenses requiring the determination of factual issues renders Ironshore's request for judgment on the pleadings both misplaced and premature." *Id.* at 18.

## V.   DISCUSSION

Ironshore requests judgment on its claim seeking the issuance of a declaration that "The Crosby must satisfy the Retention even when the duty to defend is tendered and even if no indemnity is required." (SAC, ECF No. 50 at 12.)

Federal courts apply state law to interpret an insurance policy.[1] *See Travelers Prop. Cas. Co. of Am. v. ConocoPhillips Co.*, 546 F.3d 1142, 1145 (9th Cir. 2008). Under California law, "interpretation of an insurance policy is a question of law." *Waller v. Truck Ins. Exchange, Inc.*, 11 Cal. 4th 1, 18 (1995). "The ordinary rules of contract interpretation apply equally to contracts of insurance." *Am. Alternative Ins. Corp. v. Superior Court*, 135 Cal. App. 4th 1239, 1245 (2006). "The mutual intention of the contracting parties at the time the contract was formed governs." *Id.* "In construing the language of an insurance policy, a court should give the words used their plain and ordinary meaning, unless the policy clearly indicates to the contrary." *Giddings v. Indus. Indem. Co.*, 112 Cal. App. 3d 213, 218 (1980). Courts "read a contract as a whole in order to 'give effect to every part, if reasonably practicable, each clause helping to interpret the other.'" *Van Ness v. Blue Cross of Cal.*, 87 Cal. App. 4th 364, 372 (2001) (quoting Cal. Civ. Code § 1641). "Where contract language is clear and explicit and does not lead to an absurd result, [the court] ascertain[s] [the parties'] intent from the written provisions and go[es] no further." *Id.* However,

---

[1] The parties agree that California law applies.

ambiguities are generally construed against the insurer and "insurance coverage is interpreted broadly so as to afford the greatest possible protection to the insured …." *MacKinnon v. Truck Ins. Exch.*, 31 Cal. 4th 635, 648 (2003), *as modified on denial of reh'g* (Sept. 17, 2003); *see County of San Diego v. Ace Pro. & Cas. Ins. Co.*, 37 Cal. 4th 406, 415 (2005).

Apart from Section VI(C) of the Policy (the "tender provision"), the Policy operates as a standard directors and officers liability policy ("D&O policy")—The Crosby has a duty to defend any Claim, Ironshore has a duty to indemnify The Crosby for its losses (including costs incurred by The Crosby in defending the Claim) in excess of $150,000 and up to the $1,000,000 over the policy period, and Ironshore has a duty to advance defense costs to The Crosby once The Crosby has expended $150,000 in connection with a Claim. *See, e.g., Helfand v. Nat'l Union Fire Ins. Co.*, 10 Cal. App. 4th 869, 879 (1992) ("D & O policies generally do not obligate the carrier to provide the insured with a defense. More likely, they require the carrier to reimburse the insured for defense costs as an ingredient of 'loss,' a defined term under the policy."); *see also* Croskey et al., Cal. Practice Guide: Ins. Litig. § 7:1557 (2022) ("D&O policies … generally do not contain a duty to defend separate from and in addition to the duty to indemnify. Instead, defense costs are a part of the 'loss' insured against. The insured is responsible for retaining counsel (subject to insurer consent) and conducting the defense of the claim, typically with the insurer having a duty to 'advance' defense costs on the insured's behalf as they are incurred.").

However, the tender provision fundamentally changes this framework by permitting The Crosby to tender the defense of a Claim to Ironshore. The tender provision states:

> The **Insured**, and not the **Insurer**, have the duty to defend all **Claims** …. The **Not-For-Profit Entity** may at its option tender to the **Insurer** the defense of a **Claim** …. Upon such a tender of the defense of a **Claim**, the **Insurer** shall assume the duty to defend.

(Ex. A to SAC, § VI(C), ECF No. 51 at 17.) It is undisputed that The Crosby tendered the defense of the Henkel and Blasi Claims to Ironshore, and that Ironshore was obligated to immediately assume a duty to defend those Claims. (*See* ECF No. 57-1 at 14 (Ironshore's

acknowledgement that "once The Crosby tenders, Ironshore has an obligation to appoint counsel for [T]he Crosby, control the defense, pay counsel, and oversee counsel").) This is significant because, as a default rule, an insurer's duty to defend includes an obligation to fund the defense, separate and apart from any duty to indemnify the insured for loss. *See Buss v. Superior Court*, 16 Cal. 4th 35, 49, 58 (1997) (stating that an insurer with a duty to defend must "mount and fund a defense" and that unless "the policy itself provided for reimbursement … the insurer may not seek reimbursement" of defense costs for potentially covered claims); *Aerojet-Gen. Corp. v. Transport Indem. Co.*, 17 Cal. 4th 38, 58 (1997) (stating that the duty to defend "requires the incurring of reasonable and necessary costs"). Further, "any limitation on the insurer's defense obligation"—including the obligation to fund the defense—"must be conspicuous, plain and clear." *Legacy Vulcan Corp. v. Superior Court*, 185 Cal. App. 4th 677, 696 (2010).

The issue presented by the pleadings is whether the Policy conspicuously, plainly, and clearly limits Ironshore's obligation to fund the defense post-tender. Specifically, the parties dispute whether defense costs incurred by Ironshore in connection with its post-tender duty to defend are subject to the Retention such that The Crosby is required to reimburse Ironshore for those costs.[2]

The "Retention" section of the Policy provides that The Crosby "shall be responsible for, and shall hold [Ironshore] harmless from, any amount within the Retention," which applies to "all covered **Loss**, including **Costs of Defense**." (Ex. A to SAC, §§ V(A), (B), ECF No. 51 at 16.) The definition of Costs of Defense does not differentiate between costs incurred by Ironshore and costs incurred by The Crosby. Considered in isolation, the broad language of these provisions implies that the Retention is always applicable in determining the allocation of defense costs, regardless of whether those costs are incurred in the first

---

[2] The Court interprets Ironshore's requested declaration as asserting that the Retention applies to defense costs incurred by Ironshore because such costs are the only costs that would be incurred "when the duty to defend is tendered and … no indemnity is required." (SAC, ECF No. 50 at 12.) This interpretation of the requested declaration is consistent with the parties' briefing.

1  instance by the insured (when no tender is made) or the insurer (when the defense of a

2  Claim is tendered).

3  However, when read as a whole, the language of the Policy counsels against this

4  implied limitation on Ironshore's obligation to fund the defense of a tendered claim. First,

5  despite the significant implications of Ironshore's assumption of a duty to defend, no

6  provision in the Policy other than the tender provision addresses the existence of

7  Ironshore's post-tender duty to defend, let alone explicitly limits the duty or provides a

8  mechanism for the reimbursement of Ironshore's defense costs. To the contrary, several

9  provisions in the Policy assume that any defense would be mounted by The Crosby and not

10  Ironshore. *See, e.g., id.* § II(C) (excluding "salaries, wages, overhead or benefit expenses

11  associated with any **Insured**" from Costs of Defense, but not addressing the treatment of

12  similar expenses if Ironshore is mounting the defense); *id.* § VI(A) (prohibiting The Crosby

13  from incurring Costs of Defense or settling Claims in excess of the Retention without

14  Ironshore's consent, but not addressing how Costs of Defense are incurred or how Claims

15  are settled—particularly, Claims settled for an amount within the Retention—if Ironshore

16  is mounting the defense); *id.* § VI(D) (stating that Ironshore "shall at all times have the

17  right, but not the duty, to associate with the **Insured** in the investigation, defense or

18  settlement of any **Claim**"); *id.* § VI(F) (providing for the advancement of Costs of Defense

19  from Ironshore to The Crosby upon satisfaction of the Retention, but not addressing the

20  treatment of defense costs incurred by Ironshore). Further, the only provision other than

21  the tender provision that explicitly discusses the duty to defend incorrectly states that

22  Ironshore never has a duty to defend under the Policy, which is contrary to the plain

23  language of the tender provision. *See id.* at 4 ("This Policy does not provide for any duty

24  by the Insurer to defend those Insured under the Policy."). These omissions and

25  inconsistencies weigh against a finding that the Policy conspicuously, plainly, and clearly

26  limits Ironshore's obligation to fund the post-tender defense because they suggest that the

27  provisions imposing a Retention were instead only intended to address Ironshore's

28  indemnification obligation.

Further, the definition of Loss excludes "any amount for which the **Insured** [The Crosby] is not financially liable or which is without legal recourse to the **Insured**." *Id.* § II(L) at 11. Absent some agreement to the contrary, defense costs incurred by Ironshore fall within this exclusion because they are not amounts for which The Crosby is financially liable or with legal recourse. While Ironshore contends that this Loss exclusion was intended to limit rather than expand Ironshore's liability under the Policy, at a minimum, the plain language of the exclusion creates substantial ambiguity regarding whether the Retention is applicable to Ironshore's defense costs.

In summary, the Policy does not explicitly purport to limit Ironshore's duty to defend. Such a limitation cannot be clearly discerned from the provisions discussing the general applicability of the Retention because the Policy, read as a whole, suggests that the Retention provisions were not intended to address Ironshore's post-tender duty to defend. Further, defense costs incurred by Ironshore post-tender are facially excluded from the definition of Loss and so are not unambiguously subject to the Retention in the first place. For these reasons, the Court is unable to conclude that the Policy imposes a "conspicuous, plain and clear" limitation on Ironshore's obligation to fund the defense post-tender. *Legacy Vulcan Corp.*, 185 Cal. App. 4th at 696.

Ironshore contends that if it is not entitled to reimbursement of its defense costs, "the tender provision allows [The Crosby] to skip its obligation to ever pay the [Retention] … by simply tendering the Claim to Ironshore," which "produces an absurd result." *Id.* (emphasis omitted). Where analysis of contract language produces an absurd result, it may be appropriate to look beyond the language of the contract. *See Van Ness*, 87 Cal. App. 4th at 372. However, Ironshore's concern that The Crosby could avoid ever paying the Retention by tendering claims is not supported by the language of the Policy—after tendering a claim, The Crosby remains responsible for satisfying the Retention with respect to other types of Loss (such as Loss stemming from judgments or settlements). Further, The Crosby's receipt of a financial benefit for tendering the defense of a Claim in instances where no other Loss is incurred is counterbalanced by its loss of control over the selection

of counsel and defense of the action. *See* Croskey, § 7:1612 (stating that D&O policies typically do not provide for an insurer's duty to defend in the first place because "D&O policies were intended to cover the corporation's 'brain trust,' and the directors and officers usually do not want to have matters as delicate as their personal defense left to the control of an insurance company"). This tradeoff precludes a finding that an analysis of the relevant Policy language produces an absurd result. The Court concludes that Ironshore is not entitled to Judgment on the Amended Pleadings.[3]

## VI.   CONCLUSION

IT IS HEREBY ORDERED that the Motion for Judgment on the Amended Pleadings (ECF No. 57) is denied.

Dated:  November 30, 2022

Hon. William Q. Hayes
United States District Court

---

[3] Accordingly, the Court does not address The Crosby's contention that judgment on the pleadings is independently barred by The Crosby's affirmative defenses.